COMMONWEALTH *vs.* GEORGE H. NASSAR.

Essex.    March 5, 1968. — May 6, 1968.

</div>

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Jury and Jurors. Practice, Criminal,* Examination of jurors, Voir dire, Suspension of trial, Judicial discretion, Remark by judge, Argument by counsel, Charge to jury, Assigned counsel. *Constitutional Law,* Due process of law, Trial by jury. *Evidence,* Relevancy and materiality, Photograph, On cross-examination, Of identity. *Robbery. Attorney at Law. Nunc Pro Tunc. Supreme Judicial Court,* Supervision of inferior courts.

On the record of a murder trial, there was no merit in a contention by the defendant that the judge, who put to each of the prospective jurors the questions required by law and also put suggested additional questions to them, improperly denied the defendant adequate opportunity for questioning of prospective jurors and abused his discretion. [252–254]

There was no error where, during a murder trial, the judge refused to excuse one of the jurors on the basis of mere unsubstantiated hearsay

information that that juror had been "friendly with" the victim, and that juror later participated in rendering a verdict of guilty. [254–255]

The constitutional right of the defendant in a murder case to an impartial jury representing a cross section of the community was not violated by exclusion from the jury of all prospective jurors whose views on the death penalty would preclude them, irrespective of the evidence, from joining in a verdict requiring that penalty. [257]

There was no error at a murder trial in the admission of answers by the victim's widow to relevant, routine questions as to his ownership of business premises where the crime occurred and the hour when he went to work; or of testimony by a police officer as to his selecting a photograph, without disclosure that he took it from police "identification files"; or of testimony by a witness who had been a parole officer, without disclosure of that fact. [257–258]

The record of a murder trial did not show undue restriction of the scope of cross-examination of a principal witness for the Commonwealth who had been an eyewitness of the murder. [258–259]

The judge at a murder trial did not err in denying voir dire examinations prior to the testifying of two eyewitnesses of the murder who were expected to testify that they identified the defendant as the murderer. [259]

On the record of the trial of an indictment for a murder closely observed by two eyewitnesses, testimony by them identifying the defendant as the murderer was not rendered inadmissible by the circumstances in which, shortly after the murder, two police officers, not assigned to the investigation of the murder, showed a photograph of the defendant selected by one of them to each of the eyewitnesses, who said "that's him." [262]

Where the judge at a murder trial, late one morning, adjourned the trial until the next day and made money available to defence counsel in order that he might investigate a surprise witness for the Commonwealth, there was, on the record, no abuse of discretion in refusing a further continuance for additional investigation. [263–264]

No error appeared where the judge at a murder trial, in the presence of the jury, said to counsel for the defendant that it was not counsel's duty to explain the law concerning the defendant's right not to testify. [264]

At a murder trial at which the principal issue was whether the defendant was the murderer, eyewitnesses to the murder testified identifying him as the murderer, and the judge's charge adequately dealt with that issue, the judge was not required to give an instruction requested by the defendant that "experience has shown that eyewitness identifications are frequently erroneous." [264–265]

Evidence at the trial of an indictment for a murder by shooting of the proprietor of a filling station warranted instructions to the jury on the theory that the shooting occurred in the course of an attempted armed robbery. [265]

In the circumstances, where it appeared that at the beginning of a second

trial of an indigent defendant for murder in the first degree, competent counsel who had represented the defendant at the first trial sought to be designated as appointed counsel but the judge denied the appointment by reason of Rule 95 of the Superior Court (1954) requiring that appointed counsel in a capital case have ten years of experience at the bar, after which counsel continued with the defence until the close of the trial, this court authorized the Superior Court, nunc pro tunc, to make the designation sought and to order payment of compensation. [265-267]

INDICTMENT found and returned in the Superior Court on January 8, 1965.

Following the decision by this court reported in 351 Mass. 37, there was a second trial before *Macaulay, J.*

*Charles M. Burnim* for the defendant.

*John J. Jennings,* Assistant District Attorney, for the Commonwealth.

CUTTER, J. In *Commonwealth* v. *Nassar,* 351 Mass. 37, 44-45 (the first Nassar case[1]), we reversed Nassar's death sentence. He was again found guilty of murder in the first degree after a new trial, August 14-23, 1967. The new jury, however, recommended that the death sentence be not imposed. Nassar was sentenced to life imprisonment. The case is before us under G. L. c. 278, §§ 33A-33G, as amended. The evidence was essentially that recited in the first *Nassar* case, 351 Mass. 37, 39-40, with some omissions and with the addition of the testimony of a new witness mentioned below.

On September 29, 1964, Mrs. Rita Buote and her daughter Diane, then fourteen years old, drove into a filling station on Route 125 in Andover to purchase gasoline. The proprietor Irvin Hilton was on his knees in front of the lubricating bay, looking up at a man holding a gun in his hand. This man fired a shot at Hilton, who fell over on his side. Hilton was then shot three more times.

The assailant walked rapidly toward Mrs. Buote's vehicle and approached the door on the driver's side. She had

---

[1] *Nassar* v. *Commonwealth,* 341 Mass. 584, dealt with a wholly different series of events. The reversal in the first *Nassar* case, 351 Mass. 37, was based largely upon error in receiving certain ambiguous alleged admissions by Nassar, which tended to show accusation of a prior similar crime.

locked the door. He pointed the pistol at her and pulled the trigger twice. The gun did not fire. The man started banging on the window. Mrs. Buote thought she heard him say, "open the door." He stood still for a moment, and looked toward the highway. Mrs. Buote got down on the floor of the vehicle, and could no longer see the assailant. Diane crouched on the seat. When both soon rose, the assailant was gone. Mrs. Buote and Diane identified Nassar as the assailant in circumstances described below.

These events were also observed, from a more distant point, by two men, Reginald Mortimer and William King, occupants of a truck, which had been driven into the filling station while the murder was in progress. When they realized what was going on, Mortimer backed his truck and pulled out of the station. The assailant climbed into a black automobile with black and white Virginia license plates, no. 960–647, and drove in the direction of Lawrence. Mortimer and King described the assailant as approximately five feet seven to eight inches tall, about 135 pounds in weight, in his twenties or thirties, and clad in a trench coat. Neither identified Nassar as the assailant. Mortimer said that he would not be able to recognize the assailant if he saw him again. King would be able to give "[o]nly a general description," for "[w]e were too interested in getting out of there."

The principal issue is whether Nassar was in fact the assailant. Other evidence not summarized above, so far as relevant to matters argued, is discussed in the course of dealing with the assignments to which such evidence is pertinent.

1. Nassar contends that his attorney was improperly denied adequate opportunity to question prospective jurors, with the consequence that he was unable intelligently to exercise his right to sixteen peremptory challenges. See G. L. c. 234, § 29.[2] At the outset, the trial judge gave all

[2] As amended through St. 1963, c. 187, § 29, provides, in a capital case, for twelve peremptory challenges plus one extra for each of the four additional jurors, empanelled under c. 234, § 26B, as amended by St. 1965, c. 355, § 1.

the members of the venire careful, full, general instructions concerning their obligations and about the questions which would be put to them. He cautioned them against discussing or reading about the case prior to their interrogation. He put to each juror the questions required by c. 234, § 28,[3] and under our decisions. See e.g. *Commonwealth* v. *Ladetto.* 349 Mass. 237, 245. He dealt with the matter of additional questions as the names of individual jurors were drawn. In accordance (see *Commonwealth* v. *Ventura,* 294 Mass. 113, 116–118) with our long standing practice, inquiry of prospective jurors was only by the judge. A trial judge is required only to ask those questions prescribed by statute or court decision. Other questions are in his discretion. *Commonwealth* v. *Taylor,* 327 Mass. 641, 646–647. *Commonwealth* v. *Geagan,* 339 Mass. 487, 502–508, cert. den. 361 U. S. 895. *Commonwealth* v. *Kiernan,* 348 Mass. 29, 35–36, cert. den. 380 U. S. 913. *Commonwealth* v. *Monahan,* 349 Mass. 139, 156–157. *Commonwealth* v. *Nassar,* 351 Mass. 37, 40–41. We see no occasion to alter our "dignified, expeditious, and fair practice" (see *Geagan* v. *Gavin,* 181 F. Supp. 466, 474 [D. Mass.], affd. 292 F. 2d 244, 248–249 [1st Cir.], cert. den. 370 U. S. 903), although in other jurisdictions a different practice may exist. Cf. e.g. *United States* v. *Napoleone,* 349 F. 2d 350, 353–354 (3d Cir.); *People* v. *Coen,* 205 Cal. 596, 604–607; *People* v. *DeLordo,* 350 Ill. 148, 152–156 (in which the judge was shown to have engaged in somewhat summary conduct); *Fedorinchik* v. *Stewart,* 289 Mich. 436, 438–439 (no inquiry about a statutory disqualification); *Oden* v. *State,* 166 Neb. 729, 730–

---

[3] Section 28 reads, "Upon motion of either party, the court shall, or the parties or their attorneys may under the direction of the court, examine on oath a person who is called as a juror therein, to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein; and the objecting party may introduce other competent evidence in support of the objection. If the court finds that the juror does not stand indifferent in the case, another shall be called in his stead." See also G. L. c. 278, § 3, which reads, "A person whose opinions are such as to preclude him from finding a defendant guilty of a crime punishable with death shall not serve as a juror on the trial of an indictment for such crime." Section 3 has been in effect since 1836. See Rev. Sts. c. 137, § 6. No explanation of its adoption is set out in the Report of the Commissioners on the Revision of the Statutes (1836), part IV, pp. 54–55.

735.   We think that our practice has operated fairly to
defendants and has been conducive to proper, just judicial
administration.   We see no reason to believe that any other
method would produce more impartial or more competent
jurors.   There is ample power in this court to review whether
a trial judge has committed any abuse of discretion in refus-
ing to put additional questions, or otherwise to test members
of the venire for bias or interest.   See, in this connection, the
very broad scope of review of capital cases under G. L.
c. 278, § 33E, as amended through St. 1962, c. 453.

The trial judge in this case went to a considerable length
to put suggested additional questions to prospective jurors.
He exercised his discretionary power fairly and reasonably,
with the consequence that a broad inquiry was made.   See
*Commonwealth* v. *Subilosky*, 352 Mass. 153, 157–161.   Cf.
*Bailey* v. *United States*, 53 F. 2d 982, 983–984 (5th Cir.).
He gave consideration to the possible effect of a particular
news broadcast and a newspaper article.   At the close of
the selection of jurors, although the Commonwealth's
peremptory challenges had been exhausted, Nassar had one
unused.   We think that the voir dire was patient, adequate,
and impartial.

A related assignment of error concerned a juror, who on
the voir dire answered questions in a manner wholly con-
sistent with lack of bias.   No challenge for cause was made.
No suggestion was made that he be asked additional ques-
tions.   No exception to his selection was saved.   During
trial Nassar's counsel brought to the attention of the judge
a telephone call from one Brady to Nassar's mother report-
ing that this juror had been "friendly with the decedent."
This occurred on August 21.   Prior to the charge on August
23, Nassar's attorney reported to the judge that he had
been unable to get in touch with Brady.   The judge de-
clined, when the matter was first raised, to act on hearsay
information.   Prior to the charge, he refused to excuse the
juror when after two days there had been no substantiation
of the hearsay complaint.   The juror participated in the
verdict, for he was not one of the four extra jurors excused

by lot after the charge (see fn. 2).  The judge had before him no such substantial or direct information as should have led him to take any action concerning the juror.  Cf. *Remmer* v. *United States,* 350 U. S. 377, 380–381 (approach by an F.B.I. agent during trial); *United States* ex rel. *De Vita* v. *McCorkle,* 248 F. 2d 1, 5–10 (3d Cir. en banc — alleged fraud of juror in concealing matter; opinion by majority of court), cert. den. 355 U. S. 873.

2. It is asserted that Nassar may have been harmed by the exclusion from the jury of persons holding scruples against the imposition of capital punishment.[4]  Nassar contends, with some exaggeration of the facts disclosed by the record (see fn. 5 below), that thereby he was deprived of a constitutional right to trial before an impartial jury representing a cross-section of the community.  This contention is made, despite the circumstance that this jury recommended that the death sentence not be imposed on essentially undisputed facts establishing a brutal, cold-blooded murder by some person.

A closely related contention we recently rejected in the *Ladetto* case, 349 Mass. 237, 246–247.  Our statutory disqualification (G. L. c. 278, § 3) of jurors, "whose opinions are such as to preclude . . . finding a defendant guilty of a crime punishable with death," has already been quoted (fn. 3).

During the selection of the jury, Nassar's counsel saved an exception to "excusing . . . any person because" the

---

[4] The judge's correct view of the relevant law is shown by part of his initial explanation of the process of jury selection to the whole venire.  He said, "[I]t is the [Massachusetts] law . . . that murder in the first degree without recommendation by the jury that the sentence of death be not imposed is punishable by death.  Now, if you have any opinion against capital punishment, then you must ask yourself whether that opinion would conscientiously prevent you from finding a defendant guilty should you be convinced of his guilt, upon the evidence beyond a reasonable doubt, of the crime of murder in the first degree.  It may be that some of you would prefer that the laws . . . should be changed to abolish capital punishment, but that opinion . . . does not, standing by itself, preclude you from serving as jurors.  Other jurors have entertained such belief, yet have courageously and fairly discharged their duties . . . uninfluenced by their private beliefs.  It is only when a juror could not . . . [in] any circumstances, notwithstanding the evidence and its strength, find a defendant guilty of an offense punishable by death that he is ineligible to serve."

judge found that the person "does not believe in capital punishment" on the ground that excusing such a person would result in a jury more ready to convict than one which included persons opposed to capital punishment. This general exception was saved after the judge had excused from service a woman who, as counsel agreed, should have been excused in any event. In other instances,[5] exceptions were saved where the opinions concerning the death penalty of a person excused may have been at least one of the reasons for the excuse. The judge, however, took pains to ascertain whether each excused prospective juror would have been unable, because of his opinion, to act objectively.

Over a long period, it has been held proper to excuse a prospective juror from service in a capital case if his views on capital punishment would preclude him from joining in a verdict resulting in a death sentence. See cases collected in the *Ladetto* case, 349 Mass. 237, 246–247, and annotation, 48 A. L. R. 2d 560. Our statute prescribes the death sentence for murder in the first degree, "unless the jury shall by their [unanimous] verdict, and as a part thereof, upon and after consideration of all the evidence, recommend that sentence of death be not imposed, in which case" the punishment is life imprisonment. See G. L. c. 265, § 2, as amended through St. 1956, c. 731, § 12; *Commonwealth* v. *McNeil*, 328 Mass. 436, 441–442. The legislative policy should not be thwarted by allowing jurors to sit in capital cases who are not prepared to examine the evidence impartially and to enforce that policy if (a) the

---

[5] One juror was excused who could "only accept a guilty finding . . . with life imprisonment as against death" and did not "know how . . . [he] would react" in trying a crime of great atrocity. One was excused who could not render a verdict of guilty in the first degree. Another was excused whose opinion seems to have been based upon a preconception of guilt or innocence rather than on the death penalty. Two members of the venire had opinions which "would interfere with . . . rendering an impartial verdict on the evidence." Another person excused was unusually indefinite in answering questions. On the other hand, the final juror seated was one who stated that he did not "believe in capital punishment," and who, if he "thought . . . [the defendant was guilty, would vote] life imprisonment," but who denied that his opinion was such that it would interfere with an impartial verdict on the evidence.

evidence convinces them of a defendant's guilt beyond a, reasonable doubt, and (b) they find in the evidence no mitigating or other circumstances which lead them to recommend that the death sentence not be imposed.

Members of the public now entertain a wide variety of views about the death penalty. See Thorsten Sellin, The Death Penalty (Report for Am. Law Inst. Model Penal Code Project, 1959), esp. p. 14, et seq. In view of G. L. c. 278, § 3, however, we follow the rule of our cases,[6] which in our opinion does not impair any constitutional right to an impartial jury. That rule, in effect, excludes only those who (because of their views on the death penalty and to avoid its imposition), if they could not obtain a unanimous recommendation that the death penalty be not imposed, would convict of a lesser crime than first degree murder or acquit without conscientious consideration of what crime was established by the evidence.[7]

3. Nassar contends that irrelevant, prejudicial evidence was admitted.

(a) Mrs. Hilton, widow of the murder victim, answered only eight questions. Other witnesses, of course, could have been used to establish Hilton's ownership of the filling station where the crime occurred and the hour at which he went to work. The questions asked of her, however,

---

[6] The Supreme Court of the United States has granted certiorari to consider on constitutional grounds an issue much like that discussed above. See *Bumper* v. *North Carolina*, 389 U. S. 1034 (to review 270 N. C. 521); *Witherspoon* v. *Illinois*, 389 U. S. 1035 (to review 36 Ill. 2d 471, 475–476). We decide this case with recognition that our decision may be affected by the decision in the two Supreme Court cases. Cf. *People* v. *Miller*, 245 Cal. App. 2d 112, 138, cert. granted only on other issues, 389 U. S. 968. Cf. also *Crawford* v. *Bounds, Warden*, 395 F. 2d 297 (4th Cir.).

[7] A closely similar situation would exist if a prospective juror should declare that he would not enforce any other criminal statute for violation of which a defendant was being tried. Such a person in effect would be prepared to substitute his judgment of the public interest for that of the Legislature. To exclude from jury service such persons seems to us to differ completely from discriminatory exclusion of a whole group, because of race, religion, economic status, national origin, background, or similar broad characteristics. As the judge appears to have interpreted G. L. c. 278, § 3 (fn. 3), he has excused jurors only because individually their strong beliefs prevented them from acting impartially on an issue to be brought before them. There is, of course, no occasion now to consider any problems which may conceivably be presented in a case where, upon a first degree murder conviction, a jury has not recommended that the death penalty be not imposed.

were relevant.  They were of a routine nature and had no tendency to inflame the jury.

(b) Testimony was admitted that Officer Fitzpatrick (mentioned later in this opinion), while performing his duties, selected a picture about two and a half hours after seeing in a newspaper a sketch supposed to resemble Hilton's murderer.  In the first *Nassar* case, 351 Mass. 37, 42–43, we held that it was error to admit evidence that the officer "went to the identification files" to find the picture.  It was said to be "common knowledge that the 'identification files' of the police contain pictures of men who have previously been connected with criminal activity, and, therefore, testimony about the process by which the photograph was selected should be excluded."  At this second trial, however, there was no reference to "identification files."  Reasonable efforts were made to comply with our earlier decision. See fn. 8.  Officer Fitzpatrick's testimony was as neutral and colorless as it well could have been in view of the unavoidable inference that police ability to obtain a photograph promptly suggests that it was found in their files.

(c) Testimony of Louis Devine, who had been a parole officer, was given without disclosure, or even intimation, of that fact.  We think that the assistant district attorney amply complied with our earlier caution (351 Mass. 37, 46–47) with respect to this testimony.

4. Nassar contends, by various assignments of error, that the cross-examination of Mrs. Buote was unduly restricted.

(a) We held in the first *Nassar* case, 351 Mass. 37, 47, that it was not error (1) to refuse to put the defendant (as Nassar's counsel desired to do in this trial also) in a position adjacent to Mrs. Buote's automobile to demonstrate physical facts allegedly inconsistent with her testimony, and (2) to exclude a conversation between Mrs. Buote and an investigator concerning her belief that there was "additional evidence establishing" Nassar's guilt.  We adhere to the view, then expressed, that the scope of cross-examination in such matters is within the discretion of the trial judge.

The judge could reasonably view a question to her, asking whether she understood that her "testimony . . . identifying . . . [Nassar] is sufficient to warrant his conviction," as involving an issue of law not properly to be put to one not a lawyer.[8]

Mrs. Buote's cross-examination dealt with a wide range of matters. Examination of it as a whole does not indicate any substantial or improper restriction of the scope of examination.

(b) The trial judge, in his discretion, reasonably denied voir dire examinations prior to Mrs. Buote's and Diane's testimony. Each was expected to testify, and did testify, principally that she identified Nassar as the murderer. Nassar's counsel, however, contends that these identifications were induced by the Buotes' prior examination and identification of a photograph of Nassar, which, he submits, was shown to them in circumstances which require that the identifications be excluded entirely. See the first *Nassar* case, 351 Mass. 37, 39–41.

This is not the type of situation in which a voir dire would be usual. Compare the situation relating to confessions. *Commonwealth* v. *Rogers*, 351 Mass. 522, 529–531. *Commonwealth* v. *LePage*, 352 Mass. 403, 410. The effect of allowing a voir dire on this type of testimony would be to hear much evidence twice. The record indicates no useful purpose to be served by thus prolonging the trial. In any event, the full facts bearing upon the propriety of the identification procedures are now before us in the very complete record.

5. Without referring definitely to particular assignments of error, Nassar contends that the "identification evidence

---

[8] She had already testified that she understood "the significance of . . . . [her] identifying . . . Nassar as the man who committed the brutal homicide" (words used by his counsel in his question). As this was a second trial of a case, in which at the first trial a death sentence had been imposed, she could hardly have failed to know the importance of her testimony. The record shows no basis for suggesting that Mrs. Buote entertained any bias except such opinion about Nassar's guilt as might be based on her belief that she saw him commit a murder. The question was not an apt one to elicit information concerning whether she was relying on other evidence to buttress her identification.

. . . was unreliable from the beginning" and should not have been admitted. The evidence concerning events which preceded the Buotes' identification of Nassar is summarized below.

Mrs. Buote and Diane saw the crime committed. Each had an opportunity closely to observe the murderer without a hat and without glasses. Each talked promptly with the police at the scene of the crime. Each gave the police some description of Hilton's assailant.[9]  On the night of the murder, each of them was shown a group of pictures, not including one of Nassar. They did not identify any one of the pictures as portraying the murderer. The next day Officer Tammany of the Andover police force talked with Mrs. Buote. Together they prepared a sketch of the murderer, as she recalled him, with corrections made under her guidance in an effort to reflect "a fair likeness" of the assailant she had seen. This sketch was later shown to Diane, who was not present when it was prepared. The sketch was published in the newspapers the next day, with a report that the police "were looking for a man that looked like" the sketch.

On the night of September 30 to October 1, 1964, a Lawrence police officer, Joseph Fitzpatrick was on station duty. He saw the sketch in the issue of a Lawrence newspaper for October 1. As a consequence, he selected a photograph (portraying a front face and profile of a man's head and shoulders) and showed it to his superiors, although he had not previously "been assigned to the investigation into" Hilton's death.[10]  Without making any effort to get in touch with "Lieutenant Leary or anyone . . . working on the case," Sergeant Kennan of the Lawrence police force,

---

[9] Diane then indicated that one of the assailant's eyes "didn't line up." She, despite her mother's failure to observe this, stuck to this point at all stages. The jury during trial were given opportunity to observe Nassar, in this respect as in others.

[10] He then had no experience in the use of photographs in identification; he was not ordinarily assigned to investigations; he had never "worked in the detective division"; he had not "been briefed as to the state of the investigation," and he knew that Detective Lieutenant Leary of the State Police was ordinarily assigned to the district attorney to head homicide investigations.

who had no training as a detective, and Officer Fitzpatrick went to the Buote house together with Nassar's photograph [11] about 7 A.M. They showed the photograph (selected by Officer Fitzpatrick) to Mrs. Buote, separate from Diane. "She wasn't too sure" when she saw the profile picture, but, when she was shown the full face, she said, "That's him." Later, Diane, who had been asleep, was brought into the room. She was separately shown the photograph and said, "[T]hat's him, that's the one." Later, the two Lawrence officers delivered the photograph to Lieutenant Leary.

Sometime during that day, Lieutenant Leary and Sergeant Deyermond (of the Andover police) showed Mrs. Buote, by herself, a number of pictures. She picked out Nassar's photograph. Later, Diane also did so separately. As already noted, both Mrs. Buote and Diane identified Nassar in the court room.

It, of course, would have been better practice for these Lawrence policemen to have consulted the State and Andover officers charged with investigating the crime, when Officer Fitzpatrick "found in . . . [his] own mind [similarity] between the [Nassar] photograph and the composite . . . [sketch] printed in the newspaper." Officer Fitzgerald acted on what he agreed was "[s]ort of on a hunch." The Lawrence officers' visit to the Buotes occurred at a time when (so far as the record shows) there was no suspect and when the police had no real leads. It then would have been natural for those investigating the crime to produce before the Buotes, from time to time, photographs of people who resembled the sketch. Lieutenant Leary and Sergeant Deyermond, as soon as they had the opportunity, tested the Buotes with a number of photographs, including that of Nassar whose family lived in the Lawrence area. We think that the Lawrence officers' action did not bar the use of the Buotes' testimony.

[11] The photograph introduced in evidence at this trial was a double picture, profile and front face, of Nassar of a type frequently used in police files. The district attorney introduced a copy of the original without any number or other writing on the front or back of either picture.

The record does not indicate to us that there was any effort either by the Lawrence officers or by any officer actually charged with the investigation to influence the Buotes improperly to make an identification. The Buotes had both had a good, recent, close look at the murderer, in circumstances which neither of them was likely to forget. Nassar's photographs show his face to be one likely to be remembered. The full facts concerning the identifications were before the jury for whatever bearing they might have upon the weight to be given to the Buotes' testimony.

We recognize that, as in *Simmons* v. *United States,* 390 U. S. 377, 386, the action of the two Lawrence police officers had "fallen short of the ideal." These events, however, occurred in 1964, long before the decisions (June, 1967) in *United States* v. *Wade,* 388 U. S. 218 (lineup procedures), and *Gilbert* v. *California,* 388 U. S. 263, 272–274, 296. Because, see *Stovall* v. *Denno,* 388 U. S. 293, 300–301, these decisions are not retroactive, we do not consider whether those cases have application to facts such as here appear.

On "the totality of the circumstances" (see 388 U. S. at p. 302), we conclude that there was nothing in the process of identification adopted in this matter, in an effort to get some clue to the solution of a baffling crime, which was unreasonable in the light of the whole situation or was conducive to irreparable mistaken identification. See *Commonwealth* v. *Blackburn, ante,* 200, 203. We hold that the Buotes' identifications of Nassar in open court were properly received in evidence.

6. There was one significant witness who did not testify at the first trial. Ruth Watson, a telephone operator, testified that she was riding in Andover on September 29, 1964, in an automobile with a friend, Mrs. Gertrude White. A motor vehicle with Virginia plates "cut . . . [them] off, so that . . . [they] had to turn to the right sharply." She identified Nassar in the court room as the driver.

On cross-examination she stated that she first reported this identification to the police about eight months after the murder. She had seen the composite sketch in a Law-

rence newspaper and later had seen there Nassar's photographs. She realized that the Virginia automobile had been found in Andover and had been used in the murder.[12] Mrs. White had advised her, when they talked about it, not to "become involved . . . because . . . [Mrs. White] live[s] alone and you never know what could happen." This, she said, was the reason she "didn't go to the police." After she had gone to the police she had picked Nassar out of two photographs of a lineup of twelve men, apparently photographs of a lineup conducted at the time of Nassar's original arrest. She had previously seen news photographs of Nassar.

At the close of her testimony, just before a recess at 11:25 A.M. on August 21, 1967, near the end of the trial, Nassar's counsel asked for time to investigate this surprise witness. It was represented to the judge by the assistant district attorney that (although he had known about her) he had not used her at the first trial, even as a rebuttal witness, because he had "felt she was not necessary." The trial judge adjourned the case until the next day and made available to defence counsel $200 for investigation of the witness. Prior to 10:20 A.M. on August 22, an investigator and defence counsel had interviewed Miss Watson and Mrs. White. The telephone company had declined to let the investigator make investigations, apparently in its offices (without the permission, not granted, of its legal department), to determine whether Miss Watson had talked with other employees about the Andover incident. Nassar's counsel conceded that he had "no doubt," as a result of his talks with the two ladies, that they had in fact "passed a blue car with Virginia plates" and "at the place they say they passed." He conceded also "that it was the same car, sometime before the murder."

---

[12] This vehicle belonged to a naval officer attending Massachusetts Institute of Technology. The evidence indicated that the vehicle had been stolen from a Cambridge parking lot at a time when it contained two guns and ammunition. The jury obviously did not believe, and had no reasonable basis for believing, that the vehicle's owner had any connection with the murder, with Hilton, or with Nassar.

The judge declined to grant a further continuance of the case for additional investigation. Nassar's counsel then conducted further cross-examination of Miss Watson. He also put Mrs. White on the stand as his witness. She herself was able to testify only that the driver of the Virginia automobile they had seen on the afternoon of the murder was a man, and that Miss Watson, when the "newspaper sketch was being discussed" after its publication, had "passed a remark that it resembled the one that she saw."

Whether to allow a further continuance, after the Commonwealth had rested, was a matter within the discretion of the trial judge. The judge could reasonably be of opinion (a) that further investigation would be unlikely to be productive of more than cumulative proof of matters already brought out on cross-examination, at most going to the weight of Miss Watson's testimony, and (b) that delay in submitting the case to the jury, "locked up" for the duration of the trial, would be undesirable. There was no abuse of discretion.

7. Mention should be made of certain other matters argued by Nassar.

(a) The judge properly informed Nassar's counsel that it was not the latter's duty to explain the law concerning Nassar's right not to testify. *Commonwealth* v. *Vanetzian,* 350 Mass. 491, 494. Counsel had already sufficiently indicated that instructions on this subject would be given by the judge. As Nassar's brief concedes, "the judge did indeed give adequate instructions." We perceive no error and no objectionable reproof to counsel in what the judge said in the presence of the jury. Cf. *Commonwealth* v. *McLaughlin,* 352 Mass. 218.

(b) The judge charged adequately on the issue of the identifications. The jury had heard and seen the identifying witnesses, who had been subjected to thorough, searching cross-examination. The judge permitted Nassar's counsel to emphasize in argument the importance of this issue. The judge charged fully and clearly on the jury's duty in weighing evidence and on the subject of reasonable doubt.

He was not obliged to charge, as requested by Nassar, "that experience has shown that eyewitness identifications are frequently erroneous." He had adequately indicated the criteria of judging the evidence and the witnesses. See *Commonwealth* v. *Monahan,* 349 Mass. 139, 170–171, and cases cited.

(c) The judge properly gave instructions on the theory that the murder could be found to have taken place in the course of an attempted armed robbery. To be sure, there was no evidence that any money had been taken from Hilton or his premises, or that the assailant left the scene of the crime with precipitant haste. There was, however, evidence (1) that blood stains had been found near the cash register and near the office; and (2) that there had been interruption of what was going on from the unexpected arrival of the Buotes, Mortimer, and King at the scene of the crime. There was evidence from which it could be inferred that Nassar needed funds. See the first *Nassar* case, 351 Mass. 37, 46–47. There was no indication of any motive for the brutal killing other than robbery (although, of course, proof of motive was not necessary; see *Commonwealth* v. *Dawn,* 302 Mass. 255, 263).

8. Other assignments of error need not be discussed.

9. In accordance with our duty in a capital case (G. L. c. 278, § 33E, as amended) the whole record has been examined with a view to determining whether there was any miscarriage of justice. See *Commonwealth* v. *Kerrigan,* 345 Mass. 508, 509–510, 513. Obviously the propriety of a conviction in this case depends largely upon an appraisal of the identification testimony. In making this, we recognize that we, unlike the judge and jury, did not see or hear the witnesses, an opportunity of great importance in determining issues of credibility. We perceive nothing in this record of a carefully and conscientiously conducted proceeding which leads us to conclude that justice requires a new trial.

10. Counsel, who appeared for Nassar at his first trial, sought early in the second trial to be designated as appointed

counsel for Nassar. Concerning this request the trial judge made findings summarized below.

Nassar was indigent. Various donors provided funds for the defence of Nassar at the first trial. His attorney received some compensation from this source. These funds were not sufficient to provide compensation to counsel for prosecuting (in forma pauperis) the appeal from the sentence at the first trial. Nassar's counsel was competent to defend him. It was advantageous to have the attorney, who had defended Nassar at the first trial, act also at the second trial. Substitution of new counsel at the outset of the second trial would have caused delay and inconvenience, as well as substantial expense to the county.

The trial judge denied the motion for appointment because of Rule 95 of the Superior Court (1954) which requires that, in a capital case, appointed counsel have ten years' experience at the bar. Nassar's counsel, although competent, did not have the ten years of experience.

We do not suggest that, in a case of original appointment of counsel, Rule 95 should not be applied to limit appointments in capital cases to attorneys of ten years' experience. In the circumstances of this second trial, however, the rule may operate to deny just compensation to counsel, who has performed necessary services. Although the trial judge by himself properly declined to disregard the rule, we are of the opinion that, in the circumstances, the interests of justice require that this court, in the exercise of its general supervisory and statutory powers, authorize the trial judge (or if he should not be available, any judge of the Superior Court designated by the Chief Justice of that court) to select Nassar's attorney as appointed counsel and in his discretion to order compensation paid to him. See G. L. c. 211, § 3, as amended through St. 1956, c. 707, § 1; c. 277, §§ 55, 56; *Grady* v. *Treasurer of the County of Worcester,* 352 Mass. 702, 703–704; *Abodeely* v. *County of Worcester,* 352 Mass. 719, 722–725. This may be done nunc pro tunc upon renewal of the prior request for appointment, supplemented as the judge of the Superior Court hearing the re-

quest may order. The facts found by the trial judge concerning this request, as printed in the present record, are to be taken as established.

· 11. The judgment is affirmed. In the Superior Court there may be further proceedings concerning the appointment and compensation of Nassar's counsel as indicated in the preceding paragraph (part 10 of this opinion).

*So ordered.*