**George NASSAR, Petitioner-Appellant,**

v.

**Douglas VINZANT, Superintendent, etc., Respondent-Appellee.**

**No. 74–1429.**

United States Court of Appeals, First Circuit.

June 26, 1975.

Certiorari Denied Oct. 14, 1975. See 96 S.Ct. 202.

Lois M. Lewis, West Newton, Mass., by appointment of the Court, for petitioner-appellant.

Barbara A. H. Smith, Asst. Atty. Gen., with whom Francis X. Bellotti, Atty. Gen., and John J. Irwin, Jr., Asst. Atty. Gen., Chief, Crim. Div., were on brief, for respondent-appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Appellant, George H. Nassar, was convicted in the Massachusetts Superior Court for the first degree murder of Irvin Hilton. On appeal the judgment was vacated by the Supreme Judicial Court, which held that evidence of Nassar's prior criminal record impermissibly had been allowed to reach the jury. *Commonwealth v. Nassar,* 351 Mass. 37, 218 N.E.2d 72 (1966). The Commonwealth retried Nassar, and he was again convicted. This judgment was upheld by the Supreme Judicial Court, *Commonwealth v. Nassar,* 354 Mass. 249, 237 N.E.2d 39 (1968), and the Supreme Court denied his petition for a writ of certiorari, *Nassar v. Massachusetts,* 393 U.S. 1039, 89 S.Ct. 662, 21 L.Ed.2d 586 (1969). In 1974, Nassar filed a petition for a writ of habeas corpus in the district court, 28 U.S.C. § 2254, alleging that the identification procedures utilized in the course of the investigation of Hilton's murder served to deny him his rights to a fair trial under the sixth and fourteenth amendments. The district court, without holding an evidentiary hearing on appellant's contentions, *see* 28 U.S.C. § 2254(d), granted appellee's motion to dismiss the petition. After obtaining the requisite certificate of probable cause, *id.* § 2253, Nassar filed the instant appeal.

Analysis of appellant's claim requires that we sketch relevant portions of the evidence offered at his trial:

On September 29, 1964, at approximately 3:45 p. m., Mrs. Rita Buote and her daughter, Diane, drove into a filling station in Andover, Massachusetts, intending to purchase gasoline. In the station, near the lubritorium, the proprietor Irvin Hilton was on his knees looking up at a man who held a gun in his hand. This man shot Hilton, who fell over on his side. The man then fired three more shots into Hilton's body.

Hilton's assailant walked rapidly toward the Buote vehicle, approaching the door on the driver's side. Mrs. Buote locked the car door, preventing the man from opening it. The man then pointed the gun at Mrs. Buote and twice pulled the trigger, but the gun did not fire. The man began banging on the window and attempted to get the door open. Failing this, he stood for a moment and looked toward the highway. Both Buotes crouched below the seats of their vehicle, and when they arose a short time later the assailant had gone.

These events were also observed by two men who had driven into the filling station while Hilton's murder was in progress. Their vehicle was more distant than that of the Buotes, however, and owing to this and to their interest in "getting out of there," these men were unable to provide more than a general description of the assailant.

They did observe that the murderer departed the station in what they described as a black automobile bearing Virginia license plates with the number 960–947.[1] This information was important in view of another witness, Ruth Watson, who testified that approximately 3:15 p. m. on the afternoon of September 29, 1964, she had seen a car fitting this description on a road in Andover close by the Hilton filling station. Watson had not testified at Nassar's first trial, and her taking the stand at the second caught the defense somewhat unprepared. After obtaining a short continuance to check out her story, however, and after attempting to shake her story, appellant's counsel stated that he

---

1. An automobile fitting this description was later found abandoned. Investigation revealed that it had been stolen the morning of the murder.

was satisfied that Watson had seen the vehicle as she described.

Police investigation of the Hilton murder focused upon the Buotes, as they were the only persons known to have observed the assailant sufficiently to identify him. The police obtained descriptions of the assailant from both Mrs. Buote and Diane. On the night of the murder each was shown a spread of photos, not including any of appellant, but they could not select any of these as being that of the murderer. The next day Mrs. Buote assisted an Andover police officer in the preparation of a sketch of the man she had seen. This sketch, which Mrs. Buote agreed was "a fair likeness" of the assailant, was then shown to Diane. The sketch was published in the newspapers the following day, with information that the police were looking for a man resembling the sketch.

A Lawrence, Massachusetts, police officer, who was on station duty the night of September 30 to October 1, saw this sketch in the October 1 edition of a Lawrence newspaper. The officer was in no way connected with the murder investigation being conducted by the Andover police, and had no training as a detective. On a "hunch", he selected a photo of appellant from police files and showed it to his superiors. A bit later that morning the officer and another member of the Lawrence police force, without any attempt to contact the Andover police concerning the Hilton investigation, took this photo of Nassar to the Buote home. Arriving there at approximately 7 a. m., they displayed the photo, a "mug shot" portraying appellant in both profile and fullface views, to Mrs. Buote. Initially she wasn't sure, but upon seeing the fullface portion in better light she stated, "That's him." Later, Diane was brought into the room and was separately shown the photograph. She also identified it as being a picture of the man they had seen murder Irvin Hilton. The two Lawrence officers subsequently delivered this photo of Nassar to the And-

over police. Sometime later that day, two Andover policemen went to the Buote residence and showed both Mrs. Buote and Diane, separately, a number of pictures. Each picked out the same photo of Nassar that they had identified early that morning during the visit from the Lawrence police.

At the trial Mrs. Buote and Diane each identified appellant as the man they had seen shoot Irvin Hilton. In addition, there was testimony presenting for the jury the Buotes' out-of-court identifications of Nassar's photo under the circumstances above described. Ruth Watson testified that the man she had seen driving the car with the Virginia license plates shortly before the murder was George Nassar. The foregoing, with the exception of some testimony tending to a show a possible motive for robbery, constituted the entire case for the prosecution.

Appellant contends that his identification by the Buotes was the result of impermissible police suggestion violative of his constitutional rights. He argues that showing the Buotes a single photo shortly after they had arisen necessarily implanted in their minds the suggestion that the police thought the man in the photograph had committed the crime, and that this so tainted the validity of the Buotes' identifications as to require reversal of his conviction. This claim was fully considered by the Supreme Judicial Court on Nassar's second direct appeal, and that court rejected it, as did the district court below. We agree with these conclusions, while concurring in the Supreme Judicial Court's criticism of the actions of the two Lawrence police officers.

■ Appellant's claim is to be tested against the requirement that a conviction will be set aside "only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of . . . misidentification." *See Simmons v. California,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *Neil v. Big-*

*gers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).[2]

■ We can agree that the arrival, at 7 a. m., of two police officers bearing a single photograph carries some suggestive connotations. But we do not think those facts sufficient in themselves to support the conclusion that appellant's conviction must be vacated. Insofar as cases such as *United States v. Fowler,* 439 F.2d 133 (9th Cir. 1971), may be read to announce a per se rule condemning as constitutionally infirm all evidence derived from single photo identifications, *see Workman v. Cardwell,* 338 F.Supp. 893, 895–96 (N.D.Ohio 1972), *aff'd,* 471 F.2d 909 (6th Cir. 1972), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2748, 37 L.Ed.2d 161 (1973), we do not follow them. Single photo identifications do, indeed, present so serious a danger of suggestiveness as to require that they be given extremely careful scrutiny, but beyond stating this, we cannot provide a rule of thumb, as every suggestive identification case must be tested under the "totality of the circumstances" standard of *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). *Simmons, supra* 390 U.S. at 383, 88 S.Ct. 967; *Neil, supra* 409 U.S. at 196, 93 S.Ct. 375.

■ The circumstances surrounding the Buotes' selection of appellant's photo were less conducive to misidentification than those in *Fowler* and *United States v. Workman,* 470 F.2d 151 (4th Cir. 1972). Since the Buotes had already, been shown a spread of photographs after the crime, the showing of one more photo on the morning of October 1 was to some extent a continuation of an ongoing process of looking through police photos. We held a somewhat similar train of events "not . . . unduly suggestive" in *Cooper v. Picard,* 428 F.2d

1351 (1st Cir. 1970). This is not to say that viewing the earlier photos did more than reduce the suggestive force inherent in the Lawrence officers' actions; it does not by itself remove the problem. But, weighing this factor with those which tend to support the validity of the Buote identifications, we are of the opinion that the likelihood of misidentification was not so great as to justify invalidation of appellant's conviction.

Both Buotes had seen the murderer at close range, in good light, and in a situation likely to fix his image firmly in their minds. They did not select any photos from the spread presented to them the night of the murder, indicating both that they had a sufficiently good recollection of the assailant's features to distinguish him from others and that they were not overly predisposed to produce a suspect for the police. In her description to the police Diane described the murderer as having something unique about his eyes, a feature which her mother had not observed. This tends to show both the extent of Diane's observation of the man and her ability to recall what she had seen. Mrs. Buote's ability to construct a sketch of the murderer the next day shows to some extent the detail of her recall; and as this was introduced into evidence along with the photo which the Buotes later identified, the jury could compare the sketch, the photo, and appellant's features as seen in the courtroom in order to assess the accuracy of the Buote identifications. Finally, the identification which the Buotes made occurred only two days after the crime at a time when their memory of the assailant should still have been relatively fresh.

All of the above are factors which the Supreme Court has indicated are to be

**2.** The *Simmons* test, devised to deal with the possibility of prejudice from an in-court identification of a defendant following suggestive police procedures, focused upon the danger of "irreparable misidentifications." The *Neil* Court said that "with the deletion of 'irreparable' [the *Simmons* formulation] serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself." 409 U.S. at 198, 93 S.Ct. at 381 (footnote omitted). As both types of identification evidence were presented to the jury in this case, both standards would seem applicable. However, since we conclude that the procedures here did not create a very substantial likelihood of misidentification, there is no need to go beyond the *Neil* standard.

considered in evaluating the likelihood of misidentification. *Neil, supra* 409 U.S. at 199–200, 93 S.Ct. 375. In addition, they serve to distinguish this case from *Kimbrough v. Cox,* 444 F.2d 8 (4th Cir. 1971), upon which appellant heavily relies. There, two weeks after the crime, the witnesses were shown photos only of the defendant, in circumstances which the court of appeals said made it "obvious that Kimbrough was the only suspect." 444 F.2d at 10.[3] In the instant case Mrs. Buote testified that the Lawrence officers asked only if she would look at the photo they brought with them. On cross-examination defense counsel and Mrs. Buote had the following colloquy:

"Q. When the officer presented to you one photograph did you suspect or believe that this man had been singled out for some reason?

A. No.

Q. You did not?

A. No.

Q. You didn't see anything at all odd about it?

A. No.

Q. And did you make a decision there and then from the photograph alone that this was the man you had seen?

A. Did I make a decision then?

Q. Yes.

A. That was the picture of the man that I saw—"

After she had identified appellant's photo as the murderer, Mrs. Buote called for Diane, who was asleep, to come down. Mrs. Buote testified that she introduced Diane to the officers and then left the room without indicating anything to her daughter concerning her identification of the photo. Diane's testimony confirmed this, and she said that the officers had not said anything to her about the picture, that they just presented it to her for examination. Asked whether she thought at the time that the officers had caught the murderer, Diane replied she could not remember.

█ The version of events that morning thus painted by Diane and her mother was consistent with the testimony of the two Lawrence police officers. Thus, the record establishes that other than in their use of the single photo (and possibly in arriving so early), the officers did nothing else which could be characterized as impermissibly suggestive. As we reject appellant's contention that these defects alone, viewed against all the circumstances of the case, created "a very substantial likelihood of misidentification," we think the petition for *habeas corpus* was rightly dismissed.[4]

*Affirmed.*

---

3. Police attention had been drawn to Kimbrough through an accusatory phone call from his estranged wife, who had supplied the photos used in the identification. The court, describing this as "the very unusual way in which the police focused upon Kimbrough," felt that his identification was therefore additionally suspect because "the decision to present Kimbrough as the only suspect was based on rather flimsy suspicion." Appellant argues that the Lawrence officer's "hunch" selection of his photograph can be equated with Mrs. Kimbrough's·actions, but even if this were so nothing has been suggested to us indicating that this factor could have affected the accuracy of the Buotes' identification of that photo.

4. Appellant appears to make a separate argument that the refusal by the trial court to grant his request for a *voir dire* prior to admitting the identification testimony of the Buotes constitutes a ground for reversing his conviction. While the holding of a *voir dire* upon a claim of suggestive identification would have been eminently sensible practice to prevent the jury from hearing material which might later be determined inadmissible, the failure to grant such a request does not on this record amount to constitutional error. The facts relevant to the suggestiveness of the display could be explored at the trial in the presence of the jury without undue prejudice to Nassar; and the state court and now the federal courts are in a position to rule on the constitutional claim as if a hearing had originally been held outside the jury's presence.