Hillsborough
No. 7819

THE STATE OF NEW HAMPSHIRE

v.

GEORGE LECLAIR, JR.

April 7, 1978

*David H. Souter*, attorney general (*Richard B. McNamara*, assistant attorney general, orally), for the State.

*James E. Duggan*, of Concord, by brief and orally for the defendant.

GRIMES, J.    The questions we consider in this armed robbery case are whether it was proper to admit certain identification evidence and whether defendant, without being separately indicted, could be sentenced under RSA 159:2 (Supp. 1975), which provides that when a person commits a crime when armed with a pistol, he shall in addition to the punishment provided for the crime be guilty of a Class B felony. We answer both questions in the negative.

Defendant was indicted for armed robbery of one Poulicakos, a service station attendant. Prior to trial, he moved to suppress an out-of-court identification and also any in-court identification by the attendant. The court denied the motion after a hearing, and the evidence of both the out-of-court and the in-court identifications was admitted at the trial which resulted in a jury verdict of guilty. The court, in addition to the sentence imposed for the crime of armed robbery, sentenced defendant to an additional term under the provisions of RSA 159:2 (Supp. 1975). All of defendant's exceptions were transferred by *Flynn*, J.

On February 12, 1976, two men entered the service station attended by Michael Poulicakos. One asked for the key to the men's room and was told it was unlocked. Both men returned from the men's room in about five minutes, and the same man asked for cigarettes. The attendant said only cartons were sold. The man then asked for a case of Coke. The attendant walked away, picked up a case of Coke, put it down on the counter, and as he did, the other man pointed a gun at him. Both men came around the counter and told him to lie face down on the floor. Then he was told to go into the manager's office. The man with the gun stayed outside the office while the other went in with the attendant and tied him up. While the victim was in the office, the man with the gun came in for twenty or thirty seconds to ask where the key to the safe was kept. When the men finally left, the attendant walked outside and yelled to a person at the gas pumps, who came and untied him. This person described the attendant as definitely "scared" and "like he was in shock." The police were called and arrived in two minutes. The victim told the police he had been robbed and described the incident. He described the man with the gun as about 6'1", slim build, pocked complexion, and an "Afro style" haircut with brown hair. No mustache was mentioned. The next day, the victim went to the police station and assisted in the drawing of a composite which did not show an Afro hair style but rather long light brown hair. The composite had no mustache.

On September 22, 1976, seven months after the robbery, the victim came to the police station by request and was shown four photographs, including one of the defendant taken in December 1973 and one of his brother Richard. The police had received information that Richard and one Collins had bragged about committing the robbery. Detective Welch testified that the victim selected the picture of Richard as possibly being one of the robbers, but said the man with the gun had a bad complexion. Welch testified that the victim did not select the defendant, even though his bad complexion was evident in the photograph. The victim testified that he selected two of the four photographs shown him, i.e., the two of George and Richard, but that he was more sure of Richard than George. He testified that while he was looking at the photographs, the police told him that George was the one they thought it was, but he said he wasn't sure. He testified further that the police kept telling him " '[l]ook at this one' a number of times specifically," referring to defendant's picture. He states: "[i]t seemed like that was the one

they wanted. When I stopped at that one, they looked up and kind of smiled, like it was the one they wanted me to take."

A week later on September 29, 1976, the victim again came to the police station where he was shown a single photograph of defendant taken in September 1976. According to Detective Welch, this was the first time the victim identified the defendant as the person with the gun during the robbery. Later that day, the victim was told that the defendant would be brought to the station. The victim viewed the defendant and a person he knew was a police officer through a one-way mirror and identified the defendant as the robber with the gun.

The trial court found that the procedures employed at the out-of-court identification were not impermissibly suggestive and that the victim's ability to identify the defendant was based upon observations at the criminal scene and not the result of any prior confrontation or any picture he was shown. Both the in-court and out-of-court identifications were admitted.

There was evidence that the defendant had worn a mustache since he was seventeen or eighteen, and a January or February 1976 photograph of him was introduced showing a mustache.

## I.

The dangers of misidentification are well known and documented. *See United States v. Wade*, 388 U.S. 228 (1967); *Gilbert v. California*, 388 U.S. 263 (1967); *Stovall v. Denno*, 388 U.S. 293 (1967). In these cases the court recognized "[a] major factor ... [in] the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." *United States v. Wade*, 388 U.S. at 288. The Supreme Court has dealt with the problem by imposition of exclusionary rules. In a line of cases ending with *Moore v. Illinois*, 434 U.S. 220 (1977) the Court has as of now established the following rules regarding out-of-court identification.

When an out-of-court identification is made before formal charges, and thus before the right to counsel attaches, its reliability and therefore its admissibility will be determined on the basis of the totality of the circumstances, and its exclusion will not be on the sole basis that the procedures were unnecessarily suggestive. When the out-of-court identification is made after formal charges, the right to counsel attaches and any out-of-court identification without counsel

will be excluded and the prosecution will not be allowed to show that the identification had an independent source. *Id.; Manson v. Brathwaite*, 432 U.S. 98 (1977).

Thus under these cases, because the right to counsel had not yet attached in the case before us, the admissibility of the out-of-court identification would depend upon the totality of the circumstances and would not be excluded under a per se rule. *Manson v. Brathwaite*, however, is based on federal constitutional minima and does not preclude the States from adopting a per se rule under State law. *See Manson v. Brathwaite* (Stevens, J., concurring).

■  The out-of-court identification in this case was based on a single photograph and what amounted to a one-man showup. The showing of the photograph and the conducting of the showup were unnecessarily suggestive, because there were no exigent circumstances which would justify not using less suggestive methods. *See Stovall v. Denno*, 388 U.S. 293 (1967). Not only were the procedures used in this case suggestive in themselves, but the victim testified that the police by various means indicated to him that the defendant was the one they wanted him to identify, even when he was viewing the four photographs.

There is no legitimate reason for the police to use unnecessarily suggestive identification procedures. Their use poses a grave threat to society, because "if the police and the public erroneously conclude on the basis of an unnecessarily suggestive confrontation that the right man has been caught and convicted, the real outlaw must still remain at large." *Manson v. Brathwaite*, 432 U.S. 98 (1977). (Marshall, J., dissenting). Even more is involved, therefore, than the risk of convicting an innocent person, which in itself is sufficient reason for taking the most effective means of preventing such misidentifications.

Considering the complexity of the human mind and the subtle effects of suggestive procedures upon it, a determination that an identification was unaffected by such procedures must itself be open to serious question. All things considered, the consequences of misidentification are so great and the risks so high that it is questionable if a totality-of-circumstances test provides either a sufficient deterrence against the unnecessary use of one-man showups or a sufficient protection against misidentifications which may result therefrom. As the Court said in *United States v. Wade:*

> [W]here so many variables and pitfalls exist, the first line
> of defense must be the prevention of unfairness and the

lessening of the hazards of eyewitness identification at the lineup itself. The trial which might determine the accused's fate may well not be that in the courtroom but that at the pretrial confrontation, with the State aligned against the accused, the witness the sole jury, and the accused unprotected against the overreaching, intentional or unintentional, and with little or no effective appeal from the judgment there rendered by the witness—'that's the man.' 388 U.S. at 235–36 (1967).

We have recently had occasion to comment upon the impropriety of one-man showups. *State v. Butler*, 177 N.H. 888, 379 A.2d 827, 829–30 (1977). We reiterate our condemnation of them absent exigent circumstances. Although we do not adopt a per se rule at this time, continued use of unnecessarily suggestive procedures will cause us to do so, by demonstrating the inadequacies of the deterrent effect of the totality-of-circumstances rule.

Applying the totality-of-circumstances test in this case, we hold that the out-of-court identifications were erroneously admitted. The procedures used were suggestive because only one photograph and one person other than a known police officer were used. They were unnecessary because there was no emergency or exigent circumstances to justify not using a more reliable procedure. *Manson v. Brathwaite*, 432 U.S. 98 (1977). Added to this is the fact that the police by various means, earlier referred to, indicated to the victim the suspect they wanted him to identify. *Cf. Manson v. Brathwaite.* "Such a suggestion coming from a police officer . . . can lead a witness to make a mistaken identification. The witness will then be predisposed to adhere to this identification in subsequent testimony at trial." *Moore v. Illinois*, 434 U.S. 220 (1977). This is so whether the right to counsel has attached or not.

█ In applying the totality-of-circumstances test, we must weigh the corrupting effect of the suggestive identification against the five factors set out in *Neil v. Biggers*, 409 U.S. 188 (1972), to determine the reliability of the identification. The five factors are as follows: the opportunity to view, the degree of attention, the accuracy of the description, the witness' level of certainty, and the time between the crime and the confrontation. *See Manson v. Brathwaite*, 432 U.S. at 114–16.

As a matter of State law the prosecution must prove by clear and convincing evidence that the identifications were based upon observations other than, and uninfluenced by, the suggestive procedures

used. This determination does not depend upon this witness' testimony of his subjective evaluation but rather upon an objective consideration of the *Biggers* factors. The trial judge is not to be faulted for not having excluded the evidence, because he did not have the benefit of the clarification of these factors contained in *Manson v. Brathwaite*, which was not decided until after his decision.

The victim's opportunity to view the suspect at the scene was fleeting. It was the other robber to whom the victim's attention was drawn until the actual holdup occurred, and then he was placed face down on the floor, where observation would be unlikely. He was placed in the office and tied up by the other man while the man with the gun stayed outside and then came in for only twenty or thirty seconds. The person who untied him testified that the victim was "scared" and "like he was in shock." This also bears on the degree of attention paid to the features of the man with the gun. It is a far cry from the cool and "scrupulous attention to detail" paid by the trained and experienced police officer in *Manson v. Brathwaite*.

The accuracy of the description does not instill confidence. No mention was made of the mustache, of which there was strong evidence. The Afro haircut description was inaccurate as to the defendant, although it was corrected in the composite. The bad complexion was the predominant feature in the victim's mind.

The victim's level of certainty at the time of the out-of-court identification could not in fact have been high, despite his testimony, because he had failed to identify the suspect in the earlier photographic display, despite the suggestions from the police and despite the obviousness of the bad complexion.

The time between the crime and the first time the witness was asked to identify the man with the gun by photograph or other means was more than seven months. This, compared with the two days in *Manson v. Brathwaite*, is an enormous period of time which weighs heavily against credibility, especially in view of the pressures exerted by the various means used to indicate to the victim the person the police wanted identified.

■ These indicators of the victim's ability to make an accurate identification do not outweigh the effect of the highly suggestive procedures used by the police, and the State has fallen short of proving by clear and convincing evidence that the out-of-court identifications had an independent source.

There must therefore be a new trial, in which the out-of-court identification must be excluded. Whether an in-court identification

may be admitted will be for the trial court to decide in the first instance. That determination must be based on clear and convincing evidence that the in-court identification has an independent source and is not influenced by the out-of-court viewing at the police station.

## II.

Defendant contends that it was error for the trial court to sentence him under the provisions of RSA 159:2 (Supp. 1975) when he was not under indictment under that statute. RSA 159:2 (Supp. 1975) provides in relevant part that "[i]f any person shall commit or attempt to commit a crime when armed with a pistol or revolver, he shall, in addition to the punishment provided for the crime, be guilty of a class B felony...." It is further provided that the additional sentence of imprisonment shall not be served concurrently with any other time, and no part of it shall be suspended.

Although New Hampshire judges for years have generally been dealing severely with persons who commit crimes while armed, the legislature by enacting RSA 159:2 (Supp. 1975) provided an additional tool by making it a separate crime with felony punishment. Unlike RSA 651:6, which provides for extended terms of imprisonment for the crime for which a defendant has been indicted and convicted, RSA 159:2 (Supp. 1975) establishes a separate indictable crime with separate penalties. This conclusion is reinforced by the wording of a new section which replaced RSA 159:2 (Supp. 1975) by enactment of Laws 1977, ch. 403. Defendant is entitled to be separately indicted and to have his guilt or innocence determined by a jury.

The defendant also challenges the ruling of the trial court which allowed the prosecution to introduce the testimony of a police detective as to what the victim had reported to him on the night of the robbery. At a new trial the court may not rule the same way, or the prosecution, in view of the questionable admissibility of the evidence, may elect not to seek to introduce it. We therefore do not pass on the question whether its admission violated the hearsay rule.

*Exceptions sustained.*

LAMPRON, J., did not sit; BOIS, J., concurred as to part II and in the result in part I; DOUGLAS, J., concurred.