Ronald H. GULLICK, Petitioner, Appellant,

v.

Everett I. PERRIN, Etc., et al., Appellees.

No. 81–1244.

United States Court of Appeals, First Circuit.

Argued Sept. 16, 1981.

Decided Dec. 16, 1981.

Glenn G. Geiger, Jr., Penacook, N. H., for petitioner, appellant.

Michael A. Pignatelli, Crim. Justice Div., with whom Gregory H. Smith, Atty. Gen., Concord, N. H., was on brief, for appellees.

Before CAMPBELL and BREYER, Circuit Judges, VAN DUSEN,* Senior Circuit Judge.

VAN DUSEN, Senior Circuit Judge.

This is an appeal from a final judgment of the district court denying the petitioner habeas corpus relief under 28 U.S.C. § 2254 (1976). This court issued a certificate of probable cause limited to the issue of whether the petitioner's due process rights were violated because the identification procedures employed by the New Hampshire authorities were impermissibly suggestive. This court has jurisdiction under 28 U.S.C. § 2253 (1976). We will affirm.

* Of the Third Circuit, sitting by designation.

### I.

On August 4, 1977, while returning from Maine to their homes in Connecticut, Anna Waicunas and Joan Menard checked into a motel in North Hampton, New Hampshire. In the early hours of the following morning, Mrs. Waicunas, who had been sleeping lightly, became aware of sound and movement in the room. After noticing that the door to the room was open, she wakened Ms. Menard.

As Ms. Menard awoke, she too saw a figure by the door and called out. At this point the intruder stepped outside the room but in front of an open, screened window. As Ms. Menard was trying to turn on the bedside lamp, she leaned across the bed and shone the lighted lamp directly at the window. At the pretrial hearing on the petitioner's motion to suppress her identification, Ms. Menard testified that:

> "... I snapped the light on, as I did the light tipped and hit him in the face, he was by the window, he was heading for the door and he was back in the room and he had a rifle in my back before any time at all, you know, just like this. I couldn't get the lamp loose, the cord was tied around the bed.
>
> "Q How long a period of time did you have him in your view face to face with the light?
>
> "A I would say a good two seconds, a good two seconds where it was like he looked at me and I looked at him and I was really shocked."

M.S. at 56.[1] Again, at the petitioner's trial, Ms. Menard testified:

> "Q Then what happened?

> "A Well, for the minute the light hit him, I looked directly at him, he came to the window and looked at me, I looked at him. I remember thinking my exact thinking was my God, it can't be happening what was happening, remember what he looks like, remember what he looks like. The light acted like a flashlight on his face.
>
> "Q That through the screen?
>
> "A Through the screen.
>
> "Q What view did you have of his face, a profile or full face view?
>
> "A Full face."

N.T. at 172. Following these events, the intruder reentered the room wearing a mask and robbed the women after raping one of them at gunpoint.[2]

When the police arrived, Ms. Menard described the assailant as a black or darkly tanned male, five feet ten inches to six feet tall, of slender build with rounded shoulders, and 45–50 years of age. Ms. Menard testified that the primary reason for her age opinion and the thing that she most vividly remembered about the assailant was that, through the screen, he appeared to have a patch of silver hair on the front of his head. The petitioner is a 28-year old black male, six feet one inch tall, weighing 185 pounds, and of muscular build at the time of trial.[3] He has no silver in his hair.

That afternoon, Ms. Menard assisted a police officer in constructing a composite of the assailant. The trial court later found that this composite bore a substantial resemblance to the petitioner (M.S. at 215). Shortly thereafter, Ms. Menard was shown an array of seven photographs of black

---

1. Citations styled "M.S. at ___" refer to the transcript of the hearing before the Rockingham, N. H., Superior Court on the petitioner's various motions to suppress held on March 5, 1979. Citations styled "N.T. at ___" refer to the notes of testimony from the petitioner's jury trial before the same court on March 7–9 & 12–15, 1979.

2. Because of his mask, neither of the victims saw the intruder's face after he reentered the room. Mrs. Waicunas did testify, however, that she saw the intruder's profile with the mask on and noticed his "round bulbous" nose.

M.S. at 41–42. She also testified concerning his voice, manner, weight and touch. M.S. at 40–42; N.T. at 34, 36.

3. Regarding the apparent difference in weight and build between Ms. Menard's description and the petitioner's condition at the time of trial, the jury was entitled to accept the testimony that the petitioner gained weight and muscular build between the incident and the trial through an extensive weight-lifting program in prison. *See* N.T. at 296–99, 301–04, 314–19, 351–55 & 357–60.

males from which she chose the petitioner's photograph for its similarity in facial features to the assailant and another photograph for its similarity in coloring.[4] Forty-three days later, the victims returned to New Hampshire and viewed a corporeal lineup of seven black males at which Ms. Menard identified the petitioner as the assailant. The petitioner's principal objections to the lineup are that, in requesting the witnesses to attend the lineup, a police officer commented to them that "we think we got the one," and that the lineup itself contained the petitioner but not the other person chosen "for coloring" in the photo array.[5]

The petitioner was subsequently indicted for aggravated felonious sexual assault and burglary. He moved to suppress any identification testimony from the victims as being the result of improper suggestion by the police.[6] The state trial court held an evidentiary hearing and denied the motion. The trial court held that the government had met its burden of proving by "clear and convincing" evidence that no suggestive procedures were employed by the police. M.S. at 212–13, *citing State v. Leclair*, 118 N.H. 214, 217–18, 385 A.2d 831, 833 (1978), and, thus, that it was not necessary for it to consider whether the identification testimony contained the indicia of reliability set forth in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). At trial, there was testimony concerning the photo array and lineup identifications and Ms. Menard made an in-court identification of the petitioner. All of the prosecution witnesses, including Ms. Menard, were subjected to thorough and searching cross-examination by petitioner's counsel on the circumstances surrounding the identifications.[7] The trial court instructed the jury that the sole issue before them was whether or not the petitioner was the assailant (N.T. at 484) and that the questions of the reliability of a witness' testimony and how much of that testimony to accept or reject were solely for them to decide (N.T. at 481). The jury returned verdicts of guilty on both counts (N.T. at 489).

The petitioner's exceptions were transferred to the Supreme Court of New Hampshire which affirmed the conviction, holding that the trial court was correct in its ruling that the identification procedures were not suggestive so that the question of the reliability of the identification was solely a question of the weight to be given to the testimony and, as such, was a jury question. *State v. Gullick*, 120 N.H. 99, 101–02, 411 A.2d 1113, 1114–15 (1980). The United States Supreme Court denied certiorari. *Gullick v. New Hampshire*, 449 U.S. 879, 101 S.Ct. 226, 66 L.Ed.2d 101 (1980).

---

4. The New Hampshire authorities do not dispute that, for various reasons, the petitioner was an immediate suspect in this case and that the photo array and subsequent corporeal lineup consisted of Gullick and others similar in appearance to him, even though their appearance differed in some respects, notably age and lack of silver hair, from the description given by Ms. Menard. This is the cornerstone of the petitioner's argument that the entire identification procedure was impermissibly designed to focus Ms. Menard on the petitioner, regardless of her initial description.

5. At the time of the lineup, the petitioner had not yet been indicted and, thus, his right to counsel at the lineup had not yet attached. *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). Nonetheless, petitioner's then counsel was present, was permitted to make suggestions concerning the conduct of the lineup, and subsequently testified that he believed that it was fairly conducted. N.T. at 340–41.

The petitioner argues that the lineup was improper for the same reason as the photo array because it focused on the petitioner, rather than on the witnesses' description. The petitioner argues further that it is suggestive per se to hold a photo array, followed by a corporeal lineup, where the suspect is the only person to appear in both.

6. The petitioner made several other motions to suppress and a motion for a special voir dire of the potential jurors on the issue of racial prejudice. *See* M.S. at 2. None of these issues are before this court.

7. *See e.g.*, M.S. at 44–46 & 48–51, N.T. at 88–109 & 117–18 (Mrs. Waicunas); M.S. at 69–83, N.T. at 207–18, 226–50 & 254–55 (Ms. Menard); M.S. at 93–94, N.T. at 143–44, 149 & 153–54 (Officer Gorsky, who took the first description and conducted the photo array); N.T. at 289–92 (Detective Tuttle, who made the composite at Ms. Menard's direction).

**4**

The petitioner renewed these arguments in his petition for habeas corpus. The district court reviewed the record and agreed with both the state trial court and the New Hampshire Supreme Court that the identification procedures were not suggestive and that the prosecution had met its burden of so proving under the "clear and convincing" standard mandated by the New Hampshire case law. *Gullick v. Perrin*, No. 80–589–D, slip op. at 4–5 (D.N.H. Feb. 25, 1981). The district court went on to observe that even if the reliability test of *Neil v. Biggers, supra*, was to be applied, there was sufficient evidence of reliability on each point. *Id.* slip op. at 5–6. In addition, the court noted that "petitioner's able counsel in searching and thorough cross examination of the identifying witness both at the motion to suppress and in the course of trial pointed out every available discrepancy which would affect the weight of the evidence." *Id.* slip op. at 6. The court concluded "that the pretrial and trial identifications comply with applicable constitutional requirements." *Id.*

The district court denied the petitioner's request for a certificate of probable cause on March 11, 1981. This court granted the certificate, limited to the identification issue. This appeal followed.

## II.

▮ As the district court noted in its brief opinion, the problems with evaluating and dangers in relying upon eyewitness testimony are well known and have been endlessly debated. *Stovall v. Denno*, 388 U.S.

293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). *See also Moore v. Illinois*, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977); *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). We are fully aware of the teaching of those cases, as was the district court, *see Gullick v. Perrin*, No. 80–589–D, slip op. at 3 (D.N.H. Feb. 25, 1981), and the New Hampshire Supreme Court, *see State v. Gullick, supra*, 120 N.H. at 101–02, 411 A.2d at 1114, *citing State v. Leclair, supra*, 118 N.H. at 217, 385 A.2d at 832–33.[8] After a careful and thorough evaluation of the entire record in this case in light of these standards, we are led to the same conclusion as were the state courts and the district court: the procedures employed by the North Hampton Police Department in this case were not suggestive. At the outset, we cannot agree with the petitioner's contention that it was improper for the police to base the photo array on their suspicion of the petitioner. First, there is no dispute that the photo array itself was fair. Second, the record is clear that the only substantial facial difference between the petitioner and Ms. Menard's initial description is his absence of silver hair. In fact, the district court found that the composite created from her description bore a substantial likeness to the petitioner (M.S. at 215). Third, as the Supreme Court observed in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968):

---

8. We are also aware that there is a body of scholarly opinion which takes the view that eyewitness testimony is inherently unreliable and should be relied upon only with the utmost caution. *See, e.g., Manson v. Brathwaite, supra*, 432 U.S. at 118–36, 97 S.Ct. at 2254–2264 (Marshall, J., dissenting) and references cited therein. The petitioner makes substantial use of such authorities throughout his brief in arguing that we should expand the holdings of *Neil v. Biggers* and related cases to make suggestivity and reliability a unitary analysis to be resolved by the court, rather than the jury, in the first instance. *See* Br. at 25.

Because we adhere to the established view that reliability is generally a jury question, un-

less the district court first finds evidence of suggestivity, and because we agree with the conclusions of the New Hampshire Supreme Court and the district court that the procedures employed here were not suggestive, we decline the petitioner's invitation to reexamine the difficult questions raised in the literature concerning the reliability of eyewitness testimony. We simply note our agreement with the district court's observation that there is sufficient evidence in the record on which the jury could have, and must be presumed to have, found the identification reliable. *See* pages 5–6 *infra.*

"Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error."

*Id.* 390 U.S. at 384, 88 S.Ct. at 971.

■ Next, it is clear that the corporeal lineup itself was fairly conducted. The petitioner was represented by counsel, even though he had no constitutional right to representation at that point in the proceedings. *See Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). The photograph of the lineup discloses nothing suggestive about the arrangement of the lineup or the selection of the other participants. *Compare* state's exhibit 8 *with United States v. Wade, supra*, 388 U.S. at 233, 87 S.Ct. at 1935 and cases cited therein. In addition, the petitioner's then counsel, who was present at the lineup, testified that, in his opinion, it was fairly conducted (N.T. at 340–41).[9]

■■ Finally, we cannot accept the petitioner's argument that the "totality of the circumstances" discloses that the conduct of the police acted to focus the witness' attention on the petitioner. While the petitioner, quite understandably, fails to cast his argument in these terms, to adopt his reasoning

would be to establish a per se rule and require a full *Neil v. Biggers* analysis by the trial court in every case where there is both a photo array and a corporeal lineup and the defendant is the only person to appear in both. Such a procedure is not supported by *Simmons, supra, Wade, supra*, or other cases cited at page 4 above. Even if, by some attenuated application of the word, this could be called "suggestive," it is clearly not the type of suggestivity "as to give rise to a very substantial likelihood of misidentification," *Simmons v. United States, supra*, 390 U.S. at 384, 88 S.Ct. at 971, so as to require taking the issue of reliability from the jury in the first instance.[10] As we noted before, the Supreme Court itself opined, in the context of an initial identification by photograph, "[t]he danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error." *Id.* More recently, the Supreme Court has observed in a similar identification context that

"under our adversary system of justice, cross-examination has always been considered a most effective way to ascertain the truth. We decline in these cases to hold that the Due Process Clause of the Fourteenth Amendment inevitably requires the abandonment of the time-honored process of cross-examination as the device best suited to determine the trustworthiness of testimonial evidence."

*Watkins v. Sowders*, 449 U.S. 341, 349, 101 S.Ct. 654, 656, 66 L.Ed.2d 549 (1981) (foot-

---

9. There is no allegation that the police took any improper action during the course of the lineup. The petitioner does maintain, however, that the comment of the police officer who contacted the witnesses that "we think we got the one," or the very fact that the witnesses were called upon to travel the distance that they did to participate in the lineup, impermissibly suggested that the suspect would be among those in the lineup. This fact, coupled with the earlier photo array, in the petitioner's view, makes the process suggestive. We disagree. The mere holding of any lineup is likely to suggest to a witness that suspicion has fo-

cused on one or more of the participants—else why hold the lineup? Nothing in the procedure here impermissibly focuses attention on the petitioner in particular, and we therefore see no constitutional violation.

10. Neither do the facts even approach that which this court has found not to be suggestive in past cases. *See Nassar v. Vinzant*, 519 F.2d 798 (1st Cir.), *cert. denied*, 423 U.S. 898, 96 S.Ct. 202, 46 L.Ed.2d 132 (1975); *Souza v. Howard*, 488 F.2d 462 (1st Cir. 1973), *cert. denied*, 417 U.S. 933, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974).

**6**

note omitted). In this case, there was full and effective cross-examination, both at the hearing on the motion to suppress and at trial.[11] Petitioner's counsel made as forceful and complete an argument as could be made on the factual question of reliability. The jury chose to believe otherwise. Absent an initial finding of the sort of suggestivity "as to give rise to a very substantial likelihood of misidentification," the Constitution requires no more.[12]

In conclusion, we note that even though it agreed that, because the identification procedures were not suggestive, no *Neil v. Biggers* analysis by the court was necessary, the district court felt that there was sufficient evidence to find reliability on each point of that test.[13] Our reading of the record compels a similar conclusion and reinforces our belief that there is no constitutional violation in this record.

### III.

For the foregoing reasons, and in light of the thorough and careful analysis of the New Hampshire Supreme Court and the district court, the judgment will be affirmed.

Costs to be paid by the petitioner.

---

**11.** *See* note 7 *supra.*

**12.** It bears repeating that our review of, and indeed our subject matter jurisdiction over, state criminal convictions is limited to errors of constitutional magnitude. 28 U.S.C. § 2254(a) (1976). We have no supervisory power whatever over the state courts. Even where supervisory power exists, however, the courts have been reluctant to employ it to establish per se rules holding identification techniques too unreliable to be evaluated by a jury. *See e.g., Simmons v. United States, supra,* 390 U.S. at 384, 88 S.Ct. at 971 ("We are unwilling to prohibit [initial identification by photograph] either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement").

**13.** *See Neil v. Biggers, supra,* 409 U.S. at 199–200, 93 S.Ct. at 382. The Court stated its analysis as follows:

"We turn, then, to the central question, whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and confrontation."
*Id.*