Rockingham
No. 82-067

THE STATE OF NEW HAMPSHIRE

v.

ROBERT F. STOEHRER

August 31, 1983

*Gregory H. Smith*, attorney general (*Donald J. Perrault*, assistant attorney general, on the brief, and *Andrew L. Isaac*, attorney, orally), for the State.

*James E. Duggan*, appellate defender, of Concord, by brief and orally, for the defendant.

BROCK, J. The defendant was convicted after a jury trial of a class A burglary, RSA 635:1, II. The sole issue on appeal is whether the Trial Court (*Nadeau*, J.) committed reversible error when it allowed a witness to make an in-court identification of the defendant. We affirm.

The events giving rise to this appeal unfolded as follows: At 9:25 p.m., on November 23, 1980, two masked individuals broke into the home of Gordon Cheney, a former special police officer, in Newton Junction. The intruders entered the house through the front sun

porch and then burst into the living room where Mr. Cheney and his adult stepson, William Maiden, were watching television. Stirred by the sudden intrusion, the Cheneys' beagles began barking, while Maiden and Cheney "holler[ed] what was going on here . . . ." The larger of the intruders, who wore a ski mask and carried a gun, warned the two men not to move.

Mrs. Cheney, who had been in the kitchen when the intruders entered, came into the living room to investigate the commotion. Upon seeing the two masked strangers, Mrs. Cheney screamed and retreated to the kitchen, pursued by the smaller unarmed intruder.

At that moment, Cheney and Maiden took advantage of the confusion and "tackled" the larger figure. While the three men struggled, Cheney managed to tear the ski mask off the intruder's head. However, the stranger quickly wrestled free of their hold and ran for the door in a hunched posture. As he rushed out of the house, the stranger glanced back at Cheney and Maiden.

Immediately after the first intruder had completed his escape, Cheney and Maiden went into the kitchen where they eventually apprehended his accomplice. Mr. Cheney then called the Newton police.

The trial court was free, in the sound exercise of its discretion, to give *only* the instruction on first degree assault, if it concluded that the evidence warranted an instruction on no other lesser-included offense. The court, however, evidently found that the evidence warranted an instruction on the misdemeanor of simple assault, and the court informed the jury that it might consider *two* lesser-included offenses. However, given the defendant's concession that a deadly weapon was used, the jury may not have realized that it could find that the State had not proven use of the deadly weapon, and may have felt that it had no choice but to find the defendant guilty of the more serious charge upon which it had been instructed, if it found him guilty at all.

Police Chief Robert Allfrey, who responded to the reported break-in, called a composite artist, Deputy Sheriff Gene Nigro, to the scene, after questioning the family about the break-in. At 11:25 p.m., Deputy Nigro began compiling a composite picture of the escaped intruder.

It is undisputed that it was Cheney who primarily assisted in preparation of the composite sketch. Maiden was present while the composite was being prepared, but he provided only a small amount of detail to the sketch. Maiden testified at the suppression hearing that he had viewed the defendant's face from the side and rear and had

also seen the defendant's face frontally for a "second or so." Maiden stated frankly that while he had thus seen the defendant's face, he could not "make out a whole lot of detail." Nevertheless, as the composite was being completed, Maiden corrected the sketch by adding in "a little of the beard."

Upon its completion, Maiden, Cheney, and the various police officers present viewed the sketch. Chief Allfrey recalled having seen the face before; and, after making inquiries, Chief Allfrey identified the defendant, Robert Stoehrer, as the individual who, he believed, was depicted in the composite. A photographic line-up was prepared at the police station consisting of one black-and-white photograph of the defendant and five black-and-white photographs of men with similar features. The officers then returned with the photographs to the Cheney residence. Cheney and Maiden were separated and asked whether they could identify the intruder from among the array of photographs. Both men independently identified the defendant.

A complaint against the defendant and a warrant for his arrest were signed by a justice of the peace, and he was arrested and taken to the Haverhill, Massachusetts police station soon thereafter. Some time after 4:00 a.m., that same night, Cheney and Maiden were taken to the Haverhill police station to identify the defendant in person. They were separated and led individually through the entire cell block, stopping at each cell. Both Cheney and Maiden identified the defendant as the man who had broken into their home that night. They were then taken together to the defendant's cell, where they again identified the defendant.

On January 19, 1982, a hearing was held on the defendant's motion to suppress both the out-of-court and proposed in-court identifications of the defendant by Cheney and Maiden. The trial court ruled that evidence of the in-person identifications of the defendant made while he was in the jail were inadmissible at trial, because his right to counsel had been violated. *See State v. Leclair*, 118 N.H. 214, 217–18, 385 A.2d 831, 833 (1978). However, the trial court also ruled that the photographic identifications were admissible and that both Cheney and Maiden would be permitted to make in-court identifications of the defendant at trial.

While the defendant candidly acknowledges that *Cheney's* identifications were reliable and admissible, he argues on appeal that *Maiden* was improperly influenced by unduly suggestive police procedures and that the court erred in allowing Maiden's identifications of the defendant. The defendant maintains that Maiden was unduly influenced because he was present while the composite was

being prepared and participated in the photo and jailhouse identifications later that same night.

The trial court did not find the police procedures employed to have been unduly suggestive. The court also made detailed findings to support its ruling that Maiden had an accurate and independent recollection of the defendant. *See, e.g., Neil v. Biggers*, 409 U.S. 188, 190–200 (1972); *see also State v. Preston*, 122 N.H. 153, 158, 442 A.2d 992, 995 (1982). We hold that the police procedures employed were not unduly suggestive under the circumstances, and that Maiden's identification of the defendant was untainted.

■ While Cheney had a slightly better view of the defendant face to face, and therefore provided most of the details for the composite, it was not disputed that Maiden was present throughout the break-in, had struggled with, and had seen the intruder. Given these facts, it was not improper for the police to ask the two witnesses who had seen the intruder face to face to work together on a composite. Significantly, Maiden was able to provide some assistance to the police officer compiling the sketch, and he readily identified the defendant in a photographic lineup this court finds was neither suggestive nor improperly conducted. *Cf. State v. Allard*, 123 N.H. 209, 213, 459 A.2d 259, 262 (1983).

■ Because Maiden's photographic identification of the defendant was valid and uninfluenced by overly suggestive or improper police procedures, the trial court need not have gone on to examine the case in light of the factors enumerated in *Neil v. Biggers*, 409 U.S. at 199–200; *see State v. Allard*, 123 N.H. at 213, 459 A.2d at 262. In any event, this court finds ample support for the trial court's ruling that Maiden had an independent and pre-existing recollection of the defendant, which was not tainted by *any* police procedures, including the lineup which took place at the jail.

*Affirmed.*

All concurred.