UNITED STATES of America, Appellee,

v.

Michael Alan LAU,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Bruce TAYLOR, Defendant, Appellant.

Nos. 86–1255, 86–2008, 86–1256
and 86–2002.

United States Court of Appeals,
First Circuit.

Heard June 1, 1987.
Decided Sept. 15, 1987.

William L. Camper, Tallahassee, Fla., for defendant, appellant Michael Alan Lau.

Clyde M. Taylor, Jr., Tallahassee, Fla., for defendant, appellant Bruce Taylor.

Antonio R. Bazan, Asst. U.S. Atty., with whom Daniel F. Lopez Romo, U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

Before BREYER and SELYA, Circuit Judges, and RE,[*] Judge.

BREYER, Circuit Judge.

The appellants, Michael Lau and Bruce Taylor, appeal their convictions for importing and possessing cocaine and for conspiring to do so. 21 U.S.C. §§ 841(a)(1), 846, 952(a) (1982). They claim that there was insufficient evidence for conviction; they make several claims relating to a DEA informant's testimony about their participation in an earlier cocaine smuggling scheme; and they ask for a new trial because they say the government withheld exculpatory evidence. We do not believe their arguments are legally sufficient, and we affirm their convictions.

I

Appellants' first claim is that there was insufficient evidence for conviction. A reading of the record, with inferences appropriately drawn in the government's favor, *see United States v. Drougas*, 748 F.2d 8, 15 (1st Cir.1984); *United States v. Patterson*, 644 F.2d 890, 893 (1st Cir.1981), indicates the following basic series of events:

1. In the morning of August 9, 1985, appellant Michael Lau, president of St. Maarten Helicopter Service, landed his helicopter in St. Croix, Virgin Islands. He falsely told a United States customs officer that he was traveling on to San Juan, Puerto Rico, with only one passenger and that the senior inspector of U.S. customs in St. Croix had said it was all right to "preclear" the flight, that is, to grant U.S. customs clearance in St. Croix instead of San Juan. The customs officer then pre-

---

[*] Chief Judge of the United States Court of International Trade, sitting by designation.

cleared Lau without inspecting the helicopter. (Tr. 259, 262–63, 266–68.)

2. Later that day, Lau landed his helicopter in San Juan. Lau, an elderly man, and another man in a wheelchair all got off the helicopter. (Tr. 196.) Lau and the elderly man unloaded several suitcases from the helicopter and "left them between two vehicles." (Tr. 336–37.) The elderly man and the man in the wheelchair then approached appellant Taylor, a partner in Lau's helicopter company, who was standing nearby awaiting the helicopter's landing. (Tr. 339.)

3. Gus Maestrales, a charter jet pilot whom Lau had hired to fly his passengers from San Juan to Orlando, asked Taylor, the elderly man, and the man in the wheelchair if they had any luggage except the few bags they were carrying. They said, "[N]o, we've got more bags over there," and pointed to six suitcases "over by a vehicle." Maestrales's co-pilot complained that the six suitcases "weigh[ed] a ton." (Tr. 194–96.)

4. Maestrales, who was perhaps especially cautious because authorities had found $5 million aboard his jet the previous March (Tr. 216–17), thought the bags were suspiciously heavy and asked about their contents. Taylor said, "We don't have anything in there." (Tr. 198.) Later, when Maestrales insisted on being shown the contents of the bags, Taylor said they belonged to a man who had not come on the helicopter. He added, "[T]hey are not mine. We don't want you to take them, just leave the bags." (Tr. 202.) Maestrales found a customs official, who watched as Maestrales opened one of the bags. Inside was cocaine. (Tr. 203–05.) In all, the six suitcases held 193 pounds of cocaine. (Tr. 322.)

5. By the time the cocaine was discovered, however, Taylor and the man in the wheelchair had disappeared. (Tr. 277, 416.) Two witnesses said they saw Taylor pushing the man in the wheelchair quickly toward the street. (Tr. 341, 354.) One of them found the wheelchair abandoned under an airport stairway. (Tr. 342.) Another witness, who refueled Lau's helicopter

after the bags were unloaded, testified that Lau appeared nervous and in a hurry; his hands were shaking, and "[h]e was dying for the plane to be serviced." As soon as customs cleared Lau to take off, he left. (Tr. 386–88.)

The case essentially turned on whether the jury believed that Lau and Taylor knew about the cocaine in the six suitcases or whether its presence there was an unfortunate coincidence. The jury apparently concluded that the presence of the suitcases was no coincidence. We think the facts outlined above—even without the prior acts testimony we discuss below—are more than "sufficient to allow a reasonable juror to find guilt beyond a reasonable doubt." *United States v. Guerrero-Guerrero*, 776 F.2d 1071, 1073 (1st Cir. 1985) (noting that our system looks to jurors "to come up with answers that reflect the common-sense view of the community"), *cert. denied sub nom. Mosquera v. United States,* 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986).

## II

The major issues on appeal concern an additional piece of evidence. The government presented the testimony of Thomas Aiello, who said that about two and one-half years before the events described above, in January 1983, he had worked with appellants in a cocaine smuggling venture. Aiello said that he and Taylor and others had met a plane that Lau had flown into Broxton, Georgia. He helped unload from the plane a number of boxes that proved to contain 50 to 60 "football shapes" of cocaine. (Tr. 502–05, 508–10.)

Appellants make three separate claims in relation to this evidence. First, they say that Federal Rule of Evidence 404(b) bars this evidence of a prior bad act because it is relevant only to show appellants' bad character. Second, they say the trial judge should have excluded the evidence because the government offered insufficient proof that appellants were the men Aiello saw in Georgia. Third, they say they had insuffi-

cient notice of Aiello's testimony. We consider each claim in turn.

## A

Since Aiello's testimony amounts to evidence of a prior bad act, it "is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). The trial court must consider whether the evidence has any "special" purpose other than to show the defendant's bad character or his propensity to commit the crime. Then it must weigh any such probative value against the prejudicial risk that the jury will convict the defendant simply in order to punish him for his past crime or will assume that a past criminal is a bad person likely to strike again. *See United States v. Moccia*, 681 F.2d 61, 63 (1st Cir.1982). The law commits this balancing process in the first instance to the trial court, which is more directly familiar than a court of appeals with the need for the evidence and its likely effect on the jury. *See United States v. Rivera Rodriguez*, 808 F.2d 886, 888 (1st Cir.1986); *United States v. Fosher*, 568 F.2d 207, 212–13 (1st Cir.1978).

Appellants say that the Broxton incident's probative value depended upon an impermissible inference, namely that, because appellants smuggled drugs before, they would likely do so again. In our view, however, the jury might have made use of the evidence without drawing this inference. For one thing, the jury had to decide which of three persons aboard the helicopter (Lau, the old man, and/or the man in the wheelchair) likely smuggled the cocaine. The jury might have noted similarities between the August 9 incident and the Broxton incident. These included (1) the presence of a large amount of cocaine; (2) Lau's acting as pilot; and (3) Taylor's being present to receive the cocaine. In addition, although there is no evidence in the transcript about the shape of the cocaine packets seized in San Juan, samples of those

packets were before the jury, and the prosecutor implied in closing argument that they, like the packets Aiello saw in Georgia, were football shaped. (Tr. 633.) These similarities might have helped the jury to infer that the persons who smuggled cocaine into San Juan were the same as those who smuggled cocaine into Broxton.

For another thing (and more importantly), the jury had to conclude that Lau and Taylor were not the innocent dupes of a calculating smuggler who hired them, without their knowledge, to ferry him and his drug shipment into the States and who then, somehow, convinced Lau to lie to a St. Croix customs officer. The fact that Lau and Taylor were knowledgeable about cocaine, that they probably knew first hand what it weighed and had some sense of how it was smuggled, suggests that Lau (like Maestrales) might have become suspicious (if he in fact were innocent) after he was asked to take several heavy suitcases on his helicopter and to make false statements to the St. Croix customs officer. A "knowledgeable" Lau's apparent lack of suspicion makes an innocent explanation of his actions (and hence of his partner Taylor's actions) less plausible. Similarly, Lau's and Taylor's prior contact with cocaine suggests that they knew what Maestrales was concerned about from the time he first voiced his suspicions; and this fact, in turn, makes a totally naive explanation of Lau's and Taylor's subsequent actions less plausible. To refute such innocent or naive explanations of the appellants' behavior does not automatically prove appellants' guilt, but it helps draw tighter the circumstantial net convicting them.

We need not decide whether either of these two sets of inferences, standing alone, would justify the admission of this prior bad act evidence. *Cf. United States v. Pisari*, 636 F.2d 855, 858–59 (1st Cir. 1981) (holding that evidence of prior bad acts, if admitted solely to prove identity, must show "distinctive" similarities with the offense at bar). Together, however, we believe they have sufficient probative value to bring the probity-versus-prejudice

balance within the scope of the district court's lawful powers.

### B

Appellants argue that the trial judge should have excluded evidence of the Broxton incident for a different reason, namely that the government did not adequately show that *they* were participants in the earlier smuggling event. Of course, if Aiello misidentified Lau and Taylor, then his evidence has no probative value at all.

■ Before admitting Aiello's testimony, the district court held a hearing focusing upon identification outside of the jury's presence. The appellants raised the question of identification again before the jury. After reviewing the transcripts of both proceedings, we believe that the identification, legally speaking, was sufficiently certain to support admission of the evidence.

Several factors weigh in favor of a correct identification. First, Aiello twice confidently identified Lau and Taylor in open court, both before the judge and before the jury. (Tr. 444, 501, 505.) Second, Aiello had adequate opportunity to observe Lau and Taylor at the time of the Broxton incident. Before the plane landed at Broxton, he had met Lau (to give him a check), and he had gone with Taylor to inspect the landing strip. After the plane landed, he was with them for several hours. (Tr. 500–07.) *Cf. Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977) (holding identification reliable where witness had two to three minutes to observe defendant); *Simmons v. United States*, 390 U.S. 377, 385, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968) (five minutes); *Judd v. Vose*, 813 F.2d 494, 499 (1st Cir.1987) (three to five minutes); *United States v. Eatherton*, 519 F.2d 603, 609 (1st Cir.) (one minute), *cert. denied*, 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975). Third, some corroboration exists in the facts that Lau has a license to fly the type of plane used at Broxton (Tr. 583), that Taylor was nearby in Alabama at the time (Tr. 602, 607), and that Aiello consistently used the appellants' correct first names from the time that he first described the Broxton incident to drug enforcement agents. (Tr. 468.)

Several other factors, however, weigh against a correct identification. First, Aiello, in statements made soon after Broxton, incorrectly said that Lau and Taylor were about 5'8" and 5'9" tall (in fact they are about 5'11" and 6'4"; and he may have incorrectly said that Lau was clean shaven (he usually wears a beard and moustache). (Tr. 432, 455–56, 515–16, 580.) Second, considerable time elapsed between the Broxton incident and the time that Aiello positively identified photographs of Taylor (more than one year) and Lau (more than two years). (Tr. 471–72, 474.) *But see United States v. Drougas*, 748 F.2d at 28 (five-year lapse between incident and identification does not necessarily render identification unreliable). Third, Aiello saw the defendants in court a few days before he identified them to the judge. (Tr. 456–58.)

In addition to these sets of factors (pro and con), Aiello correctly identified defendants from a photo album that a DEA agent showed him sometime before the present crime took place (*i.e.*, before August 9, 1985). Several aspects of the photo identification process suggest that these identifications may have been accurate. (Tr. 470–86.) For one thing, the DEA agent altogether showed Aiello between 23 and 41 photographs of several different people, some of whom Aiello identified as Broxton participants and others of whom he did not. Moreover, since Aiello picked out the correct photos before August 9, 1985, the DEA could not have impermissibly encouraged him to identify Lau and Taylor with an eye towards prosecuting the present crime. Further, the DEA placed Lau's and Taylor's photos in the book only after having connected Lau and Taylor with a different person whom Aiello had positively identified from the beginning. (Tr. 469–70.) On the other hand, the DEA agent had shown Aiello roughly the same display of photos (except for those of Lau and Taylor) at least once (and perhaps several times) before the agent placed Lau's and Taylor's photos in the book; thus, the other photos among which Lau's and Taylor's appeared were not new to Aiello. Moreover, the

DEA agent placed not one but three pictures of Lau in the book at the time that Aiello identified him, thus, at least arguably, further increasing the risk of a false identification.

On balance, we think the pre-August 9 photo identifications sufficient to eliminate any negative implication which appellants might otherwise draw from Aiello's having seen the defendants in court a few days before he identified them. Apart from that, we do not think it can be used to significantly strengthen the in-court identification; the procedure is too seriously flawed. *See Simmons v. United States*, 390 U.S. at 383–84, 88 S.Ct. at 970–71 (police should avoid emphasizing picture of suspect in photographic identification); *United States v. Eatherton*, 519 F.2d at 608 (police should avoid repeatedly showing same picture to witness). But neither was the photo identification procedure so open to DEA "suggestion" as to undercut the reliability of the later in-court identification. After all, Aiello had no problem stating that he did *not* recognize many of the other persons whose photographs the DEA agent showed him under the same procedure.

Leaving the photo identification to one side, the in-court identification, in our view, is sufficiently reliable (despite the inconsistency about defendants' heights) as to permit the district court to allow the jury to hear Aiello's testimony. *See Simmons v. United States*, 390 U.S. at 384, 88 S.Ct. at 971 (given opportunity to cross-examine witness, "convictions based on eyewitness identification at trial ... will be set aside ... only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"); *Judd v. Vose*, 813 F.2d at 498–99; *Gullick v. Perrin*, 669 F.2d 1, 5–6 (1st Cir.1981). And, the evidence is sufficiently probative (as set out in Part IIA, *supra*), that the district court possessed the legal power to admit it. Although the appellants argue that the identification evidence was not "clear and convincing," *see United States v. Mascio*, 774 F.2d 219, 223 (7th Cir.1985); *United States v. McDaniel*, 773 F.2d 242,

247 (8th Cir.1985), we note that this circuit has not laid down a separate mechanical evidentiary test for "past bad act" identification. Rather, the strength of the evidence linking defendants to a past bad act is but one consideration that the district court must take into account when weighing its "probative value" against its "prejudicial risk." *See United States v. Rivera Rodriguez*, 808 F.2d at 888; *United States v. Moccia*, 681 F.2d at 63. Without expressing a view about whether the evidence here is or is not "clear and convincing," we conclude, on balance, that its probative value is sufficient to bring the question of admissibility within the scope of the trial court's lawful decisionmaking authority.

C

■ Appellants also claim that despite their timely request that the government disclose its intention to offer 404(b) evidence, the government failed to notify them of Aiello's testimony until December 3, 1985, six days before trial, and that even then the government misspelled Aiello's name. On the day of trial, the district court refused appellants' request for a continuance of 30 days or of 7 days in order to respond to the evidence, but it granted a one-day continuance over a long weekend. A court of appeals will not find that this kind of decision constitutes reversible error unless a defendant can show abuse of discretion resulting in serious prejudice. *See United States v. Jimenez-Diaz*, 659 F.2d 562, 567 (5th Cir.1981), *cert. denied sub nom. Salazar v. United States*, 456 U.S. 907, 102 S.Ct. 1754, 72 L.Ed.2d 164 (1982). Appellants have failed to identify any evidence that they might have found with a longer continuance, or to explain satisfactorily how otherwise they were prejudiced. We therefore find no reversible error.

III

Finally, appellants claim that, despite specific requests for exculpatory evidence, including "written or recorded statements" of appellant Taylor, the government failed to turn over tapes of two conversations between Taylor and two government

agents made in connection with another investigation. Both conversations—which occurred in April 1982, before the January 1983 Broxton incident—concern an airplane that Taylor owned together with his brother and his brother-in-law. Appellants say that in one of these conversations, Taylor said he suspected that someone was using the plane to transport drugs, that he strongly opposed any drug dealing, and that he had told the FBI that the plane had been stolen.

Appellants say that the government's failure to produce these tapes violated the disclosure rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); alternatively, they request a new trial based on the discovery of this new evidence, *see* Fed.R.Crim.P. 33. To show a *Brady* violation, however, appellants must demonstrate that the allegedly suppressed evidence was "favorable" to them and "material" to guilt. *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. at 1197. Similarly, discovery of new evidence merits a new trial only if the evidence is material and might have had some impact on the outcome of the trial. *See In re United States,* 565 F.2d 173, 176–77 (1st Cir.1977). We do not think that the tapes in question meet these standards. For one thing, appellants have not explained how they could have admitted the tapes into evidence. They amount to hearsay in respect to the truth of Taylor's statements. Fed.R.Evid. 801, 802. They could not be offered to impeach, since no trial witness speaks on the tapes. And, they could not be offered to prove Taylor's character, since the rules allow such proof only by reputation or opinion testimony. Fed.R.Evid. 405(a). For another thing, and in any event, we do not see how the evidence of Taylor's professed attitude toward drugs in April 1982 (as it appeared on these tapes) could have swayed the jury's determination of events in January 1983, much less August 1985.

For these reasons, the judgment of the district court is

*Affirmed.*